***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to receive further evidence (except the stipulated evidence submitted after reopening), or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as: *Page 2 
 STIPULATIONS
1. On October 25, 1993, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On October 25, 1993, an employment relationship existed between Plaintiff and All Payment Services, Inc. (hereinafter referred to as "Defendant-Employer").
3. October 25, 1993 is the date of the work injury by accident which is the subject of these proceedings.
4. Reliance Insurance Company provided workers' compensation insurance coverage to Defendant-Employer on October 25, 1993. Reliance Insurance Company subsequently declared bankruptcy, and Defendant-Employer is now covered by the North Carolina Insurance Guaranty Association.
5. Plaintiff's medical records, consisting of 364 pages, are received into evidence as Stipulated Exhibit one (1).
6. The deposition of Melvin L. Cheatham, M.D. is received into evidence as Stipulated Exhibit two (2).
7. The "Stipulations with Request for Award" from the Workers' Compensation Board for the State of California is received into evidence as Stipulated Exhibit three (3).
8. Plaintiff's Screen Actors Guild pension plan statements for the years 1993 through 2000 are received into evidence as Plaintiff's Exhibit P-1.
9. Following the September 25, 2007 hearing before the Full Commission, the parties stipulated into evidence the following documents:
 a. Plaintiff's Screen Actors Guild pension plan statement for the year 1992, which is received into evidence as Stipulated Exhibit four (4). *Page 3 
 b. Plaintiff's federal income tax returns from the years 1989 through 1997, which are received into evidence as Stipulated Exhibit five (5).
 *********** ISSUES
The issues for determination are:
1. What is Plaintiff's average weekly wage?
2. Whether Plaintiff is entitled to benefits under N.C. Gen. Stat. § 97-29 for temporary total disability compensation following his October 25, 1993 work injury?
3. Whether Plaintiff is entitled to benefits under N.C. Gen. Stat. § 97-30 for loss of wage-earning capacity following his October 25, 1993 work injury?
4. On what date did Plaintiff reach maximum medical improvement as a result of his October 25, 1993 work injury?
5. Whether Plaintiff subsequently sustained a change of condition under N.C. Gen. Stat. § 97-47 as a result of his August 30, 2001 back surgery?
6. Whether Plaintiff is entitled to benefits under N.C. Gen. Stat. § 97-29 for temporary total disability compensation following his August 30, 2001 surgery?
7. Whether Plaintiff is entitled to benefits under N.C. Gen. Stat. § 97-31 for a permanent partial disability rating following his August 30, 2001 surgery?
8. Whether the Screen Actors Guild is entitled to be reimbursed for medical expenses paid on behalf of Plaintiff for treatment for his October 25, 1993 work injury?
 ***********
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was a 63-year-old male, born June 26, 1943, who had worked as a stuntman for over 35 years. During the course of his career, Plaintiff worked as a stunt double for Paul Newman and for Bert Reynolds, and worked in various movies and television programs as either a stuntman or a stunt coordinator. These movies and television series included "The Undefeated," "Little Big Man," "Dan August," "Vegas," "Airport 77," "Hooper," and "The Last of the Mohicans." Plaintiff based his reputation and career on high-impact, big stunts. Plaintiff would typically be hired specifically for these high-impact, big stunts. Plaintiff worked as a NASCAR driver, and set the world land speed record in 1979 by being the first person to break the sound barrier in a vehicle. Plaintiff underwent a back fusion performed at the L4-L5 level of the spine, and at the L5-S1 level of the spine prior to the injury that is the subject of these proceedings. Plaintiff also underwent a previous fusion at the C5-C6 level of the spine. Plaintiff returned to performing active, high-impact stunts following his recovery from these back surgeries.
2. On October 25, 1993, Plaintiff was injured while working as a stuntman and a stunt coordinator on "Bandit, Bandit," a television series being filmed in North Carolina. He had been working on this television series for six (6) weeks. As part of his job as a stunt coordinator, Plaintiff was responsible for performing all of the high-impact stunts. Plaintiff's sons were also working on this job site along with Plaintiff.
3. The "Bandit, Bandit" television series was being filmed in Wadesboro, North Carolina. Plaintiff was residing in Boone, North Carolina at the time of his October 25, 1993 work injury.
4. Defendants did not complete a Form 22 indicating Plaintiff's wages. Plaintiff did not work for Defendant-Employer for the 52 weeks preceding his October 25, 1993 work injury. Thus, the Full Commission finds that Method one (1) and Method two (2) of N.C. Gen. Stat. § 97-2(5) *Page 5 
cannot be used for calculating Plaintiff's average weekly wage. Method four (4) of N.C. Gen. Stat. § 97-2(5), determining the wages of a similar employee, cannot be used, as there is no employee with employment similar to Plaintiff's employment. Method three (3) of N.C. Gen. Stat. § 97-2(5), dividing the earnings of Plaintiff by the weeks Plaintiff worked for Defendant-Employer, will not result in a fair and just result to both parties, because Plaintiff's work was contractual in nature and he would have periods of very high earnings, followed by periods where he did not work at all. At the time of his injury Plaintiff had worked for approximately six (6) weeks with Defendant-Employer on the television series "Bandit, Bandit." During these six (6) weeks, Plaintiff earned $60,000.00 for his services as both the stunt coordinator and as a stuntman. Computing Plaintiff's average weekly wage based solely on his high earnings period with Defendant-Employer would not fairly approximate the amount he would be earning were it not for the injury. Therefore, the Full Commission finds that the first four methods for computing average weekly wage under the Act would provide unfair results and that exceptional reasons exist to utilize Method five (5) of N.C. Gen. Stat. § 97-2(5) to compute Plaintiff's average weekly wage.
5. Using Method five (5) of N.C. Gen. Stat. § 97-2(5) to compute Plaintiff's average weekly wage, the Full Commission finds that due to the nature and short duration of Plaintiff's employment as set forth above, it is fair to both parties to compute Plaintiff's wages based upon his earnings over the previous year from all of his jobs. The Full Commission finds that the W-2 wage statements showing Plaintiff's earnings for 1992 and 1993 provide the better evidence of Plaintiff's earnings for the year preceding his injury.
6. Plaintiff reported income in the amount of $50,120.00 in wages, salary, and tips in 1992 based on his W-2 statement, of which $13,427.96 was from residual payments received in 1992, based upon evidence from the Screen Actors Guild. The Full Commission is not considering residual payments as wages because, as Plaintiff testified, his residual payments represent monies *Page 6 
paid to Plaintiff based upon past work in earlier years. Plaintiff earned $110,638.00 in wages, salary, and tips in 1993, of which $13,200.12 was from residual payments received in 1993, based upon evidence from the Screen Actors Guild. Subtracting residual payments, Plaintiff earned $36,692.04 in 1992, and $97,437.88 in 1993. Prior to his October 25, 1993 work injury, Plaintiff worked approximately 10 months in 1993; therefore, 10/12th of Plaintiff's prior year's wages of $97,437.88 in 1993 would be $81,198.23. Plaintiff worked two (2) months of the prior year in 1992, and 2/12th of his prior year's wages of $36,692.04 in 1992 would equal $6,115.34. Thus, Plaintiff's yearly earnings for the year preceding his October 25, 1993 work injury would be $87,313.57 and Plaintiff's average weekly wage would be $1,679.11, entitling him to the maximum compensation rate for the year 1993 of $442.00.
7. On October 25, 1993, Plaintiff was performing a stunt that involved jumping a car approximately 120 feet on the set of the "Bandit, Bandit" television series. During the process of performing this stunt, Plaintiff was travelling at a speed of 70 miles per hour. The car landed awkwardly on its side, due to a breaking shock, and snapped sideways.
8. When the car stopped, Plaintiff had intense pain in his lower back, and this pain radiated into his left leg. Plaintiff could not move his legs. Plaintiff also had pain in his neck. As a result, Plaintiff presented to Dr. Charles Scott McLanahan in Charlotte, North Carolina. Dr. McLanahan examined Plaintiff, and concluded that Plaintiff had acute lumbar pain secondary to trauma, and ordered a lumbo-sacral computed tomography (CT) scan. The lumbo-sacral CT scan, performed the same day, revealed an attempted fusion at the L5-S1 level of the spine, as well as at the L4-L5 level of the spine. Dr. McLanahan instructed Plaintiff not to participate in stunt work the next day, as it would be unsafe.
9. On October 28, 1993, Dr. McLanahan reviewed Plaintiff's October 25, 1993 lumbo-sacral CT scan, and noted that Plaintiff "will eventually need something done with respect to *Page 7 
the L5-S1 level but it is possible that this could continue to be treated conservatively as long as he is getting better."
10. Plaintiff returned to the set of the "Bandit, Bandit" television series, and attempted to continue to coordinate stunts. However, Plaintiff did not perform any other stunts on the set of the "Bandit, Bandit" television series, and Plaintiff testified that a friend on the set arranged for him to continue to receive payment, even though he simply "sat in a chair and . . . didn't do anything." At that time, Plaintiff's sons were working on the set of the "Bandit, Bandit" and Plaintiff became concerned for their safety since he was supposed to be supervising the stunts.
11. On November 2, 1993, Dr. McLanahan noted that Plaintiff's continued work as a stunt driver exposed him to considerable risks.
12. Plaintiff continued to experience significant pain in his lower back and his left leg. On November 8, 1993, Plaintiff saw Dr. Gary Wayne Pitts, an urologist, who diagnosed him with a contusion in his kidney and his bladder.
13. Due to his lower back, left leg, kidney, and bladder problems, Plaintiff became unable to continue his work as a stuntman performing high-impact stunts. However he continued to work in the industry.
14. Plaintiff returned to Dr. McLanahan on May 23, 1995. At that time, he was complaining of lower back pain which radiated into both legs, with the left side being worse than the right side, as well as neck pain, although the lower back pain was the "most significant." Dr. McLanahan recommended that Plaintiff have new radiological studies performed.
15. A lumbo-sacral CT scan performed on May 28, 1996 revealed segment instability at the L5-S1 level of the spine. Dr. McLanahan recommended that Plaintiff be seen by Dr. Frederick Eli Finger, III, one of Dr. McLanahan's neurosurgical partners, for the problems that he was having with his lower back. *Page 8 
16. Dr. Melvin L. Cheatham, a neurosurgeon from California saw Plaintiff on August 6, 1997. He reviewed and interpreted Plaintiff's October 25, 1993 lumbo-sacral CT scan to reveal a number of pre-existing conditions, including the previous fusions, as well as conditions related to his October 25, 1993 work injury. Dr. Cheatham, opined, "it is likely that the trauma suffered in the high-impact crash of the automobile he [Plaintiff] was driving for a stunt on October 24 [sic], 1993 caused disruption of the fusion at L5-S1 . . . [and] he suffered a fracture of the anterior-superior margin of the L2 vertebral body as a result of that trauma." Dr. Michael J. Brown, a radiologist, reviewed the October 25, 1993 lumbo-sacral CT scan along with Dr. Cheatham, and concurred in this opinion.
17. After obtaining a thorough history and physical examination of Plaintiff and reviewing his relevant medical records and radiological studies, on August 6, 1997, Dr. Cheatham was of the opinion that the prior fusion at the L5-S1 level of Plaintiff's spine broke loose as a result of the October 25, 1993 work injury. Further, Dr. Cheatham opined that Plaintiff was at maximum medical improvement as of the August 6, 1997 visit, with respect to the lower back issues related to his work injury. However, he did not assign any type of permanent partial disability rating to Plaintiff's lower back. Dr. Cheatham recommended that Plaintiff be treated conservatively, and that Plaintiff avoid any high-impact stunt activities.
18. In correspondence from Dr. Cheatham to Plaintiff's prior counsel dated January 28, 1998 and November 10, 1998, Dr. Cheatham stated that Plaintiff had a 50% rating to the whole body and that, with regard to Plaintiff's lower back, he was "100% disabled from doing any type of stunt work." Dr. Cheatham further stated that, "even if Mr. Barrett is able to tolerate the degree of chronic low back, buttock and occasional leg pain that he complained of on August 6, 1997, he is being placed in great jeopardy when being called upon to do stunts." Dr. Cheatham felt that Plaintiff would eventually "become a candidate for further surgery and nerve root decompression *Page 9 
and fusion at L5-S1 in the future." The Full Commission gives no weight to the permanent partial disability rating given by Dr. Cheatham in 1998, as it does not refer to a specific body part or comply with workers' compensation guidelines.
19. At Dr. Cheatham's deposition on April 18, 2002, counsel asked him to explain his statement that Plaintiff was 100% disabled from doing any type of stunt work. Dr. Cheatham initially testified that this was a whole body permanent partial disability rating. Later, however, when asked to provide a rating to Plaintiff's back, taking into consideration the previous 10% permanent partial disability rating Plaintiff received for his back in 1991, as well as other factors, Dr. Cheatham testified that with respect to Plaintiff's back, his permanent partial disability rating would actually represent 50% of the remaining 90% after the 1991 permanent partial disability rating assigned to Plaintiff's back.
20. Plaintiff saw Dr. Cheatham on March 15, 1999, at which time Plaintiff complained of chronic lower back pain, left kidney pain, and increased neck pain. Dr. Cheatham ordered further cervical radiological studies in order to evaluate Plaintiff's neck complaints, and a urology consultation in order to evaluate the left kidney complaints. With respect to Plaintiff's lower back, Dr. Cheatham concluded that he was "not able to identify any change from the findings I previously recorded" from the August 6, 1997 office visit.
21. By July 13, 1999, Dr. Cheatham finally had the opportunity to review the cervical spine radiological studies he ordered on March 15, 1999. Based upon Dr. Cheatham's review of those radiological studies, he opined that Plaintiff "developed further degenerative disc narrowing and disc bulge and spur formation at C6-C7, and this is probably secondary to previous disc injury dating to his industrial injury in 1992 or 1993." Further, Dr. Cheatham opined that Plaintiff might require anterior cervical inter-body fusion at the C6-C7 level of the spine at some time in the future. *Page 10 
22. Plaintiff continued to seek treatment from Dr. Cheatham, and on January 25, 2000, Dr. Cheatham noted that Plaintiff developed increasing difficulty with low back and intermittent left leg pain and restriction of low back motion since he last saw him on July 13, 1999. Further, Dr. Cheatham continued to opine that the October 25, 1993 work injury caused Plaintiff's previous partial fusion to break loose, and also caused Plaintiff's current lower back condition. Dr. Cheatham again expressed that Plaintiff would likely require surgery in the future in order to correct his current back condition.
23. Due to the continued worsening of Plaintiff's lower back condition as a result of his October 25, 1993 work injuries, he underwent lower back surgery performed by Dr. John Peloza in Dallas, Texas on August 30, 2001. Dr. Peloza discharged Plaintiff on September 2, 2001.
24. Plaintiff testified that in the months prior to his August 30, 2001 surgery he was in Africa helping a friend on a movie as an advisor and got to a point that he physically could not do anything. Due to increased lower back pain, Plaintiff testified that he ended up staying an extra two months in Africa. Once Plaintiff was finally able to see Dr. Peloza for a neurosurgical evaluation upon his return to the United States, Plaintiff testified that he "froze up in the . . . hallway . . . [and] couldn't move." The Full Commission finds Plaintiff's testimony credible and further finds based on Plaintiff's testimony and the evidence establishing that he required immediate surgery after he was able to get medical treatment, that Plaintiff became totally disabled from working while in Africa, at least two months prior to his surgery, even though he had not been medically removed from work by a physician at that time. The Full Commission also finds as fact based on the greater weight of the evidence that the pain and other conditions that caused the need for Plaintiff's surgery performed by Dr. Peloza on August 30, 2001 were causally related to Plaintiff's October 25, 1993 work injury. *Page 11 
25. Following Plaintiff's discharge, he traveled to Connecticut in order to recuperate from his recent surgery. While in Connecticut, Plaintiff began developing severe pain in his lower back at the surgical site and developed swelling from a fluid collection in that area. Plaintiff was unable to return to Dallas to see Dr. Peloza, due to the catastrophic events of September 11, 2001.
26. Plaintiff eventually traveled to North Carolina with his son in the latter part of September 2001, where he obtained a referral to Dr. Charles L. Branch, Jr., the Chairman of the Department of Neurosurgery at the Bowman Gray School of Medicine. Dr. Branch diagnosed Plaintiff with a dural tear and a spondylothesis with foraminal stenosis at the L5-S1 level of the spine. Plaintiff underwent another surgery on September 28, 2001. Dr. Branch discharged Plaintiff on October 2, 2001, and advised him not to bend, stoop, lift, drive, move furniture, or do any strenuous activity.
27. At his deposition, Dr. Branch testified that based upon the history he obtained from Plaintiff, the lower back symptoms giving rise to Plaintiff's August 30, 2001 surgery began to manifest approximately four (4) or five (5) months prior to the surgery. Further, Dr. Branch recalled that Plaintiff had "been hurting, he'd been putting up with it, somehow or another . . . [and] couldn't stand it." Based upon these circumstances, (which tend to corroborate Plaintiff's testimony), Dr. Branch understood that Plaintiff finally decided to see Dr. Peloza.
28. Dr. Branch was of the opinion that Plaintiff reached maximum medical improvement following his September 28, 2001 surgery by September 1, 2003 and retained a 35% permanent partial disability to his back as a result of his October 25, 1993 work injury. Dr. Branch recommended that Plaintiff not return to any physically demanding job, and felt that Plaintiff could perform only sedentary work. Further, Dr. Branch was of the opinion that Plaintiff's October 25, 1993 work injury caused the conditions for which he treated Plaintiff, beginning in 2001. In a letter dated September 9, 2003 to Plaintiff's prior counsel, Dr. Branch stated that Plaintiff bears a *Page 12 
substantial risk of the need for future medical treatment as a direct and proximate result of his October 25, 1993 work injury and the subsequent surgeries that he underwent.
29. On June 26, 2002, Dr. Alan Sanders from Los Angeles, California performed an extensive examination of Plaintiff, as well as a review of his relevant medical and other records related to his October 25, 1993 work injury. Dr. Sanders concluded, among other things, that "[w]ith regard to . . . [Plaintiff's] low back, he has constant slight to moderate pain, expected to become more than moderate on an occasional basis." Further, Dr. Sanders opined that "[w]ith regard to . . . [Plaintiff's] low back, I would recommend that he be limited prophylactically to semi-sedentary work."
30. Plaintiff's work as a stunt coordinator and as a stuntman required him to do high-impact stunts. The stunt coordinator position, while supervisory in nature, requires a stuntman who can actually perform difficult and dangerous stunts, in order to instruct others in how to perform these types of stunts, and in order to place the necessary rigging. Both the stunt coordinator and the stuntman positions are jobs that are very physical in nature.
31. Following Plaintiff's October 25, 1993 work injury, the Full Commission finds, based upon the greater weight of the evidence, that except for friendship gestures, Plaintiff was unable to obtain employment as a stuntman or stunt coordinator due to his limited ability to perform stunts. However, since Plaintiff was able to earn some wages, which represent some earning capacity at a physical level less than that required of a stuntman or stunt coordinator, after he obtained employment opportunities through friends; and, since Plaintiff managed to perform some sporadic work over a period of years before his condition worsened causing him to become totally disabled, and since Plaintiff voluntarily continued to seek work in the industry he knew well, the Full Commission finds as fact that Plaintiff was temporarily and partially disabled as a result of his injury from the date of injury until approximately two months prior to his August 30, 2001 surgery. *Page 13 
32. Plaintiff's lower back condition progressively worsened over time and caused him to become totally disabled from working at least two months before August 30, 2001, when he underwent surgery. The Full Commission finds as fact that Plaintiff remains temporarily and totally disabled from work since reaching maximum medical improvement from his 2001 surgeries on September 1, 2003. Although Plaintiff's physicians released him to "semi-sedentary" and "sedentary" work, and Plaintiff may be capable of some work, it would be futile for Plaintiff to seek employment, given his advanced age, his prior work history, his pre-existing conditions, his severely debilitating back condition due his current work related injury as well as non work related causes and his work related physical restrictions. The Full Commission finds as fact, based upon the greater weight of the evidence, that Plaintiff became temporarily and totally disabled from working in any employment at least two months prior to August 30, 2001 and remains temporarily and totally disabled as a result of his October 25, 1993 work injury.
33. Plaintiff reached maximum medical improvement for the first time on August 6, 1997, but did not receive a permanent partial disability rating that complies with Industrial Commission guidelines until Dr. Cheatham's deposition on April 18, 2002. Plaintiff has not had an opportunity to elect the more favorable remedy as no compensation has been paid and no valid ratings were given until April 18, 2002 and September 1, 2003.
34. Plaintiff's federal income tax returns, which were stipulated into evidence, establish his earnings for relevant periods after 1993 and his Screen Actors Guild pension statements establish his residual payments that should not be counted as wages from employment during the relevant periods. It is not clear from the federal income tax returns whether all of the residual payments were included as salary, wages and tips on the tax returns. Residual payments must be excluded from wages in calculating Plaintiff's temporary partial disability compensation. *Page 14 
35. Following the expiration of the 300 weeks of compensation, the Full Commission finds, that Plaintiff developed a worsening of his condition, requiring him to undergo surgery at the L5-S1 level of the spine on August 30, 2001, as well as a second surgery on September 28, 2001. As a result of the worsening of Plaintiff's condition which constituted a change of condition occurring within the statutory period, Plaintiff became totally incapable of working in any employment at least two months prior to August 30, 2001 when he underwent surgery. The Full Commission finds that Plaintiff is entitled to temporary total disability benefits beginning two months from the date of his surgery on August 30, 2001 and continuing until further order of the Commission.
36. Defendants are responsible for all medical treatment, devices, and aides, prescribed by Plaintiff's health care providers, in order to assist Plaintiff in his recovery, which were reasonable and necessary to effect a cure, to give relief, and/or to lessen the period of Plaintiff's disability from his October 25, 1993 work injury. The medical treatment rendered by Dr. McLanahan, Dr. Pitts, Dr. Cheatham, Dr. Peloza, and Dr. Branch was reasonably necessary and was causally related to Plaintiff's October 25, 1993 work injury. Defendants are responsible for payment of those medical expenses, including the reimbursement of any out-of-pocket expenses owed to Plaintiff, as well as reimbursement of any entity that paid for medical treatment related to Plaintiff's injuries.
37. The Full Commission finds as fact that Plaintiff bears a substantial risk of needing future medical treatment due to his compensable back condition.
38. Defendants did not defend this claim without reasonable grounds, and as such, the assessment of attorney's fees under N.C. Gen. Stat. § 97-88.1 is neither proper nor justified.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course and scope of his employment on October 25, 1993. N.C. Gen. Stat. § 97-2(6).
2. The Full Commission concludes that exceptional reasons exist to utilize Method five (5) of N.C. Gen. Stat. § 97-2(5) to compute Plaintiff's average weekly wage. Plaintiff's work was contractual in nature and he would have periods of very high earnings, followed by periods where he did not work at all. The Full Commission therefore concludes that it is fair to both parties to compute Plaintiff's wages based upon his earnings over the previous year from all of his jobs. At the time of Plaintiff's October 25, 1993 work injury, Plaintiff's average weekly wage was $1,679.11 per week, which yields the maximum compensation rate for the year 1993 of $442.00 per week. Larramore v.Richardson Sports Ltd. Partners, 141 N.C. App. 250, 540 S.E.2d 768
(2000); aff'd 353 N.C. 520, 546 S.E.2d 87 (2001); N.C. Gen. Stat. § 97-2(5).
3. Following Plaintiff's October 25, 1993 work injury, Plaintiff was unable to obtain employment in the competitive job market as a stunt coordinator or as a stuntman, due to his limited ability to perform stunts. The employment that Plaintiff obtained following his October 25, 1993 work injury was not due to his capabilities, but rather, due to friendship gestures. Plaintiff never regained pre-injury wage-earning capacity in the competitive job market. However, since Plaintiff was able to earn some wages, which represent some earning capacity at a physical level less than that required of a stuntman or stunt coordinator, after he obtained employment opportunities through friends; and, since Plaintiff managed to perform some sporadic work over a period of years before his condition worsened causing him to become totally disabled, and since Plaintiff voluntarily continued to seek work in the industry he knew well, Plaintiff was temporarily and partially disabled as a result of his injury from the date of injury until approximately two months prior to his August 30, 2001 surgery. *Page 15 
N.C. Gen. Stat. § 97-30.
4. As a result of Plaintiff's October 25, 1993 work injury, Plaintiff is entitled to temporary partial disability compensation at varying rates based on 2/3 of the difference between his pre-injury average weekly wage and the weekly wage he earned thereafter (calculated using the same formula as used to calculate average weekly wage) for a period not to exceed 300 weeks (July 31, 1999) and in an amount not to exceed the maximum weekly compensation rate for 1993. N.C. Gen. Stat. § 97-30.
5. Beginning at least two months prior to August 30, 2001, Plaintiff developed a change in condition, requiring him to undergo a surgery at the L5-S1 level of the spine on August 30, 2001, as well as a second surgery on September 28, 2001. N.C. Gen. Stat. § 97-47.
6. As a result of Plaintiff's change in condition, he became medically unable to work, and thus, entitled to receive temporary total disability compensation beginning two months prior to August 30, 2001 at the rate of $442.00 per week. Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993), N.C. Gen. Stat. §§ 97-29, 97-47.
7. Plaintiff remains temporarily and totally disabled since reaching maximum medical improvement from his 2001 surgeries on September 1, 2003. Although Plaintiff's physicians released him to semi-sedentary and sedentary work, and Plaintiff may be capable of some work, Plaintiff has established that it would be futile for him to seek employment, given his advanced age, his prior work history, his severe and debilitating back condition related to his current injury and non work related causes, and his physical restrictions resulting from his work related injury. Plaintiff has established temporary and total disability underRussell. Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993).
8. The treatment rendered by and through Dr. Charles Scott McLanahan and other physicians at Carolina Neurosurgery; Dr. Gary Wayne Pitts; Dr. Melvin L. Cheatham; Dr. John Peloza; and Dr. Charles L. Branch, Jr., was causally related to Plaintiff's October 25, 1993 work injury, and was reasonably necessary to effect a cure, to give relief, and/or to lessen the period of Plaintiff's disability, and Plaintiff is entitled to have Defendants pay for the same, as well as the reimbursement of any out-of-pocket expenses owed to Plaintiff, and reimbursement to any entity that paid for medical treatment on behalf of Plaintiff, relating to his October 25, 1993 work injury. N.C. Gen. Stat. § 97-25.
9. Plaintiff bears a substantial risk of the necessity of future medical treatment as a result of Plaintiff's October 25, 1993 work injury, and is entitled to have Defendants pay for the same. N.C. Gen. Stat. § 97-25.1
10 Defendants did not defend this claim without reasonable grounds, and as such, the assessment of attorney's fees under N.C. Gen. Stat. § 97-88.1 is neither proper nor justified. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following: *Page 16 
 AWARD
1. Defendants shall pay Plaintiff temporary partial disability compensation at varying rates not to exceed $442.00 per week for up to 300 weeks from the date of injury. The accrued compensation shall be paid in a lump sum to Plaintiff, subject to attorney fees.
2. Subject to a reasonable attorney's fee, Defendants shall pay Plaintiff temporary total disability compensation at the rate of $442.00 per week beginning from two months prior to August 30, 2001 through September 1, 2003, and continuing thereafter until further order of the Industrial Commission. The accrued compensation shall be paid in a lump sum to Plaintiff.
3. Defendants shall pay for all medical expenses incurred or to be incurred in the future by Plaintiff due to his compensable injury, including payment for treatment by Dr. Charles Scott *Page 17 
McLanahan and other physicians at Carolina Neurosurgery; Dr. Gary Wayne Pitts; Dr. Melvin L. Cheatham; Dr. John Peloza; Dr. Charles L. Branch, Jr. and any other medical providers who provided treatment related to Plaintiff's injuries as well as provide reimbursement to Plaintiff for out of pocket expenses and any entity paying medical bills on behalf of Plaintiff for his work related injury.
4. A reasonable attorney's fee is hereby approved for Plaintiff's counsel from the sums due Plaintiff under Paragraphs one (1) and two (2) above. Such attorney's fee shall be deducted by Defendants from Plaintiff's compensation and paid directly to Plaintiff's counsel as follows: 25% of the accrued compensation due Plaintiff and thereafter every fifth check (20%) from future compensation shall be paid to Plaintiff's counsel. From the total attorneys' fee awarded, Plaintiff's current counsel shall satisfy the lien of Plaintiff's prior counsel.
5. Defendants shall pay the costs of this action, including expert witness fees to Dr. Melvin L. Cheatham in the amount of $1,285.00, and to Dr. Charles L. Branch Jr. in the amount of $550.00, if not already paid.
This the __ day of November 2008.
S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________________ DANNY LEE McDONALD COMMISSIONER *Page 18 
 S/_______________________ BUCK LATTIMORE COMMISSIONER